All right, our next case is cause number 24-40058, Dike v. Columbia Hospital Corporation. You know, they wrote a lot better briefs than that. Yeah. Can you give them a little more time in five? All right, is the appellant ready to proceed? Is that Mr. Ponceo? Yes, Your Honor. Pronounce that correctly? Yes, Your Honor. Adam Ponceo appearing on behalf of the appellant, Mr. Lawrence Dike. May it please the Court. Your Honor, we are appearing today on the appeal of a summary judgment granted in favor of the appellees in this case, involving a claim arising under Title VII in 1981 related to race, color, and or national origin of our client, Mr. Lawrence Dike. I am counsel on appeal. The matter involved claims of discrimination, retaliation, and a hostile work environment claim based on his race, color, and national origin. And what it further expands on, Your Honor, is the interpretation under Section 703A under Title VII related to discrimination arising under Title VII. We contend that the district court in this case applied differing legal standards but the wrong standards with regard to the claims asserted by Mr. Dike. Mr. Dike is a Nigerian-born individual who was black and spoke with an accent based on his national origin and his native language. And what occurred in this case, and the record is replete, with at least ten complaints related to discrimination, disparate treatment, and an overall hostile environment created by his mistreatment by his employees. Eventually, after making numerous complaints, at least eight of them, he filed an EEOC complaint while still employed with the company and filed that in December 22nd of 2017. Most notably, what occurred was he filed a final complaint on March 15th of 2018, was disciplined subsequently on March 18th of 2018, and thereafter terminated by the company. He was terminated on March 30th of 2018. And what the trial court has done in this case is ignored both what was produced as direct evidence of discrimination and circumstantial evidence of discrimination, the standards of which differ according to the type of evidence that was produced. We challenged the underlying discrimination, and I would point to a recent case out of this court, the Wilkinson v. Pinnacle Lodging case, a Fifth Circuit case in 2023, a per curiam opinion. And each of these cases involves the interpretation of evidence and whether summary judgment is proper in a case with factual disputes and controverting evidence with regard to the basis for termination and the numerous complaints and responses of the appellees or defendants in this particular case. We contend that Mr. Dekay met his standards for pointing to economic or tangible discrimination and disparate treatment in the underlying case. They discriminated against Mr. Dekay as to the terms, conditions, or privileges of his employment, including the disparate treatment in the case. And this is more a factual argument related to the interpretation of those several factors, complaints. And we have a situation where he was supervised by a number of charge nurses and his supervising supervisors at the company to which he made complaints about the repeated discrimination and harassment. For example. Mr. Dekay was terminated? Yes, he was eventually terminated March 30th. And what's the reason they gave for the termination? They gave it with regard to he had been written up on a number of occasions, but the final termination related to a purported 90-minute absence that occurred where he had disappeared during one shift in February of 2018. What's notable is that had never been brought up until after he made his, what would be his final complaint on March 15th of 2018. He was called in and disciplined on March 18th of 2018 related to temporal proximity and showing pretext and then was terminated on March 30th. Are you traveling under temporal proximity or is there any other evidence that this was retaliatory, his termination? Well, we rely on temporal proximity and we also rely on the fact that there were changing circumstances and arguments that served as a basis for his termination. The general argument was we had written him up on a number of occasions and that he was on a final warning related to his termination. That's not an argument. That happened. Right, Your Honor, but what you see is that there were a number of false write-ups that occurred and complaints against him that had occurred after he started his pattern of complaints. For example, there was one incident where he was accused of having assaulted a patient. He asked for information with regard to that. They finally followed up with the investigating the patient and her relative who said it never happened and so they dropped that particular complaint. Well, they cleared him on that one, did they not? Yes, they did. But he had a long list of complaints that he wasn't cleared on and he had a pattern of being AWOL. They found him asleep and, I mean, they had a long list of process they went through, various warnings, and finally when he was gone for 90 minutes and they couldn't find him, they terminated him. Well, what happened with that particular incident, Your Honor, is he asked to review the videotapes during the interview where they were talking to him about his alleged absences. He asked to show the videotapes and this had occurred on a number of occasions where they made false accusations of him because they have cameras and a monitoring system. He asked to review those with him during that counseling session. They refused. They refused to provide that information and then claimed that he failed to respond to the allegations because he was not given all the evidence and or presented with at least that base information so that he could argue plausibly with regard to that particular complaint. You know, this is one judge speaking, but I think you ought to go to your hostile work environment client. I think that's your best client and I'd like to hear your argument on that. I was about to ask the same question. What is your argument as to hostile work environment? Your Honor, what we argue with regard to the hostile work environment is we've set out and the EEOC more specifically addressed that in their brief. Your argument. I want to know what your argument is. Yes, Your Honor. It's the same pattern. It was a hostile environment that started from November of 2016 when he started with the company. For example, the comments about I prefer to work with Filipino employees than black employees. I prefer Filipino food to black food. Comments from one individual, Mr. Hernandez, a co-worker nurse, who said I want you to stay 12 feet away from me. I don't appreciate your culture. I don't appreciate your race. Comments of that nature that repeatedly occurred. Now, the defendant's police position in this case is we investigated all of those complaints. But they essentially took no action. They told them to essentially smile and bear with it. But I thought your argument was the district court applied the wrong standard because of Muldrow, because of Hamilton. Well, they did, Your Honor, because of Muldrow. Well, what the district court said was, for example, it's undisputed that the facts are undisputed in this case. However, they said that the conduct that occurred with him did not rise to the level of an adverse employment action with regard to his continued employment with the company. However, Hamilton and then Muldrow changed that standard and said it doesn't have to be an economic impact. Well, it doesn't have to be an ultimate employment decision. Here he was terminated. Right, Judge. But we're talking about even with regard to the hostile environment claim, what occurred repeatedly was when he would raise a complaint, there was not a formal investigation. It was essentially a grin and bear with it, smile to make them happy, and there were not formal investigations. For example, after one complaint, when he raised a complaint, they wrote him up because of what they said was his attitude with regard to the employee against whom he was making a complaint. And you saw that repeatedly with regard to each of these ten complaints and emails and meetings with human resources and his supervisors, that they failed to properly investigate despite what they were saying, that essentially their investigations were inconclusive. They condoned this pattern of allowing patients to say, oh, we don't want to have a black man using the pejorative word, the N word. These patients would describe him and say, we don't want this N to take care of us. And the company, even though they now say, well, we didn't have a policy in place, they did have an implied policy in place that allowed to allow that disparate or discriminatory treatment to occur. After this court's opinion in Hamilton, they say even that is enough. If there were some form of disparate treatment, and that's what needs to be set out in this case, is that you applied the wrong standard. You misapplied our interpretation under Hamilton and Muldrow by the Texas Supreme Court in trying to imply that what you did is sufficient in the case. Your Honor, my time is up. If there are any other questions, the EEOC will now argue with Mr. Winkleman. Thank you, Counsel. Thank you, Your Honor. Good morning, Your Honors, and may it please the Court, Stephen Winkleman with the EEOC. The EEOC is addressing only DK's hostile work environment claim, and I'd like to start by highlighting what I think are three areas of apparent agreement. First, the hospital does not dispute the general legal proposition that an employer's policy or practice of assigning employees based on consumers' racial preferences can cause or contribute to an objectively hostile work environment. Second, the hospital does not dispute that DK testified both that charge nurses regularly changed his work assignments based on patients' racial preferences and that he repeatedly reported that practice to his immediate and direct supervisor, Esther Zamora, and on a few occasions to the director of nursing, Jason Sewell. Finally, the hospital does not dispute that it took no action to prevent race-based assignments at its facilities, and in fact, on the few occasions that it did learn about them, defended the practice. Given that, the key remaining question for this Court to resolve is whether the district court erred in declining to consider DK's testimony on that front and failing to consider it alongside evidence of other harassment. Did the plaintiff or appellant here raise any of these arguments on appeal sufficiently to allow amicus to come in and make the arguments for the appellant? Your Honor, DK's brief does argue that the district court applied the incorrect standards and that it erred. It's a Muldrow argument and a Hamilton argument, correct? Not entirely, Your Honor. I believe that his brief also highlights the court's errors in rejecting his testimony. At page 37 of his brief, he says the district court improperly disregarded DK's own testimony, showing that his charge of nurses routinely changed his patient assignments based on his race. The district court further improperly disregards DK's claim that Zamora dismissed his complaints about being reassigned or wrote him up after he complained that a patient uses a racial slur toward him. But that's it? That's the sum total of what the appellant raised as far as his testimony on appeal? Respectfully, Your Honor, I disagree. I think there are other portions of the brief that still— With regard to the hostile work environment claim? I don't know that he distinguishes whether the district court is incorrectly rejecting his testimony with respect to that claim or other claims. It is—I think his brief fairly does challenge the district court's failure to consider his testimony. And even if the court were inclined to accept the hospital's characterization of his brief as not raising those issues, I think it's important to note that the court has an independent obligation to identify and apply the correct legal standards. As the Supreme Court has said, when an issue or claim is properly before the court, the court is not limited to the particular legal theories advanced by the parties, but rather retains the independent power to identify and apply the proper construction of governing law. And that's Kamen v. Kemper Financial Services, 500 U.S. 90. And here, the district court rejected DK's testimony on the sole ground that it was self-serving. This court has repeatedly rejected that reasoning and squarely held that a plaintiff's sworn testimony can create a genuine dispute of material fact, even when it is not corroborated by other evidence in the record and cannot be discounted merely because it's self-serving. Well, there has to be enough evidence on summary judgment for a reasonable jury to find in the nonmovement's favor, right? That's correct, Your Honor. All right, and so he didn't raise any of this as far as the frequency, the pervasiveness, I guess, of these racially-based reassignments. He didn't raise that in the EEOC charge he filed. He talked about two specific incidences, I think. His charge does mention, I think, only two specific instances in which his assignments were changed. Well, more than that, it talks about those, but it never says this was happening on a couple times a weekly basis. That comes up for the first time in his deposition, correct? It is true that his charge doesn't refer to it as a practice or claim that that was repeatedly occurring, but it didn't need to. The EEOC's regulations require a charge to include only, quote, a written statement sufficiently precise to identify the parties and to describe generally the action or practices complained of. And that's at 29 CFR 1601.12b. For that reason, or consistent with that regulation, this Court and others have said that a charge does not need to include every fact on which a plaintiff ultimately intends to rely in their civil action. Instead, the scope of the civil action is defined by the scope of the investigation that could reasonably follow from that charge. The fact that he identified at least two instances in which his assignments were changed based on his race or based on patient racial preferences, a reasonable investigation would lead to, I think, a broader practice or identify a broader practice that he identified in the civil action. So, again, the mere fact that his charge did not refer to it as a practice does not preclude him from relying on those other instances in his civil action. I guess I'm interested in a couple of things. One is how large is the patient population, how many people? And then I guess the other thing would be what are the demographics, which probably would dictate how often, how frequent it is that as a result of patient preference, he's being reassigned or as a result of his race, the determining needs to be reassigned. How many people are we talking about patients? I'm not sure whether the record discloses how large the patient population was or what the demographic information was. I defer to my friend whether or not the record does include that information. I will say I don't think it matters in this case. What D.K. testified was that at least twice a week, charge of nurses changed his assignments based on patients' racial preferences, and that occurred over the course of a year. So this happened potentially hundreds of times or at least more than a hundred times over the course of his employment. Additionally, although the hospital, and I apologize, I see that my time has expired, so unless the court has any further questions. I'm going to add some time. I'll add some time to you if you want it. So I'm going to give you another five minutes. All right. You can have another five minutes. Your Honor, the hospital now argues that D.K.'s testimony constitutes inadmissible hearsay as well. I will say they did not raise that objection in the district court and therefore forfeited it. Even if this court were inclined to consider that objection, it would have to consider two subsidiary questions that the hospital does not address. First, whether that testimony in fact qualifies as hearsay under federal rule of evidence 801C, specifically whether it's being offered for the truth of the matter asserted. And additionally. The judge also excluded the nurse's statements to Mr. Dyck that patients had been switched. What? Do you have an argument about that? I'm sorry. Whichever? All right. The judge excluded the statements the nurses made to Mr. Dyck as hearsay that the patients had been switched. As I read 801 2D, statements of the opponent's employee can be admitted. I mean, have you looked at this issue? Well, Your Honor, I don't believe the district court did reject that testimony as hearsay. I don't believe at any point in the decision it declined to consider D.K.'s testimony about what he had heard from the nurses because it was hearsay. We didn't squarely address that issue. And one of the reasons is because the hospital did not raise that evidentiary objection in the district court. All right. And, of course, the judge also excluded Mr. Dyck's testimony about, well, he said his testimony was self-serving and therefore couldn't be considered. Can you defend that? Or is that defensible? Yes, Your Honor. This court has repeatedly and squarely held that a plaintiff's testimony, sworn testimony, can create a genuine dispute of material fact even when it's not corroborated by other evidence and cannot be rejected merely because it's self-serving. One of the cases we highlight is Guzman, 18F 4th, 157 at 160. And Guzman, I think, makes clear that there are guardrails in place to ensure that the testimony, first, still has to be based on personal knowledge on a matter about which the witness is competent to testify and it cannot be vague or conclusory. That's supported by Federal Rule of Evidence 56C4 and Federal Rule of Evidence 602. And I think on top of that, although Guzman does not mention that, plaintiffs are also still going to be subject to or witnesses are still going to be subject to the risk of perjury and attorneys will be subject to Rule 11 sanctions. Yeah. Now, the Cheney in the Seventh Circuit case involving patient switching, that institution had a clear policy, had a form that was filled out when they came to work. But the standard, as I understand it, under hostile work environment is negligence. So is a policy required to establish that as a basis for hostile work environment? The short answer is no. As you mentioned, the standard here is negligence, and Cheney makes clear that it's a policy or practice. It doesn't need to be a written policy or an official policy of the employer. Here it is enough that if the employer knew or had reason to know that charge nurses were regularly changing DK's room assignments based on patients' racial preferences and took no prompt remedial action to reasonably calculate it to stop that from occurring, that's sufficient to establish a policy. But the only evidence that supports that they were regularly doing this is his deposition testimony, right? Respectfully, Your Honor, I disagree. There are, I think, other aspects of the record that support that. First are DK's emails to Jason Sewell where he does identify this practice. Additionally, Jason Sewell's own affidavit states that the hospital, as a general matter, if a patient were to request a reassignment or a different caregiver based on race, that the hospital would go ahead and grant the request as long as they had other staff available. And I believe that supports DK's characterization that this was occurring. And that declaration is at ROA 445. Counsel, your time has expired. Thank you, Your Honor. Thank you. Ms. Morton. Good morning, Your Honors. May it please the Court. You may proceed. Good morning. My name is Sarah Morton, and I represent Appalese Columbia Hospital Corporation of Bay Area and Bay Area Healthcare Group Limited. Today, I will be addressing the arguments concerning appellant's hostile work environment claims. My colleague, Mr. Little, will be addressing the discrimination and retaliation adverse action claims. As an initial matter, the Court should affirm the District Court's dismissal of appellant's hostile work environment claims under 42 U.S.C. Section 1981, because as Mr. DK's trial counsel conceded at the summary judgment hearing and the trial court held, an appellant does not challenge on appeal the conduct alleged by Mr. DK in support of his hostile work environment claims all fell outside of the four-year statute of limitations for Section 1981 claims. Anything that occurred in the record before December 23, 2017, is therefore time-barred for Section 1981 purposes. As to his hostile work environment claims under Title VII, appellant's brief on this issue was based entirely on the application of Hamilton and Muldrow. Hamilton and Muldrow do not apply here with respect to Mr. DK's hostile work environment claims. But he does say something about the District Court's exclusion of his deposition testimony. He does. Yes, Your Honor. And the District Court said, well, it's self-serving. I'm going to put it aside. We're not going to consider it. Correct. That's wrong. I mean, as a matter of Fifth Circuit precedent, any party's testimony, evidence, whatever, will be somewhat self-serving. It can still create a material issue of fact. Self-serving by itself, I would agree with that statement. But in this case, the District Court found that it was not only self-serving, but it was also unsubstantiated, and that it was contradictory to the other statements by Mr. DK in the record. But you heard counsel opposite just say there's a declaration from Sewell and there are contemporaneous emails where he's complaining about weekly reassignments based on race. He is not complaining about weekly reassignments based on race in those emails. Specifically, in his emails, he complains about one time in which his patient assignment was changed due to race. And he identifies the specific date of that as June 9, 2017. He later goes on to claim in these emails that his patient assignments were being changed for other reasons, such as his gender or because he raised complaints of patient safety. But we take every inference in his favor as a non-movement on summary judgment. So deposition testimony where this was happening a couple times a week plus emails plus Sewell's declaration, isn't that enough? It's not enough, Your Honor. So first off, Sewell's declaration does not establish a practice by the hospital of utilizing patient preferences, patient racial preferences. But does it support that it was happening? It does not. In fact, Sewell's deposition testimony says that he is only aware of one occasion in which Mr. Dike's assignment was ever changed for race-related reasons, and it was because a patient, in that instance, had used an abusive derogatory term. It was the egregious case. It was a patient who had used an abusive racial term towards Mr. Dike, and in that instance, Mr. Dike's assignment was changed. He was removed from the situation in order to remedy the harassment. In that issue, they took prompt remedial action to promptly end the harassing conduct. So that is the only instance in which Sewell testified that he was aware of his assignment ever being changed. What about Zamora? Zamora said that he came in, I gather, from what she said, too often to talk to her and complain about various practices, including the patient switching. So Zamora's testimony actually refutes this as well, but Mr. Dike's testimony says that when this would happen on a weekly basis, that he would immediately report it to Marissa Zamora, his manager. That testimony, the district court found, was unsubstantiated. And it is, because it's contradictory to all of Mr. Dike's prior statements in the record. His EEOC charge, which says that his patient assignments were changed on only two occasions, the June 2017 occasion and an occasion in September of 2017. And what's your best case for the fact that you can't introduce a party's statement in a deposition unless it's substantiated? Well, Your Honor, it's interesting that you should ask that, because this court has repeatedly held that nonmovements cannot satisfy the burdens in opposing summary judgment with unsubstantiated assertions. And in fact, this court just recently held in the matter of Highland Capital Management LP, an opinion issued in September of this year, which was after the parties unfortunately had closed their briefing, that the fact that the testimony is self-serving is not in and of itself sufficient to defeat summary judgment. But coupled with the testimony's lack of detail and internal inconsistencies, such statements are insufficient to lead a rational jury to find for appellants as required. But in that case, those affidavits were woefully inconsistent, they were contradictory, and they were evolving in the course of the litigation. I mean, it was a lot more extensive. I was on that panel, actually, so I remember going into pretty good detail with that. Here we've got a deponent who says this was happening several times a week, and there isn't evidence in the record that appears to contradict that. There is, actually. Well, not contradict it. That's summary judgment. Undisputably refute it. In his September 9th email, Your Honors, which I can provide you a record site. But in his September 9th email, Mr. DeGay specifically said that, he says, this is not the first time charge nurses have switched my patient assignment because I reported patient safety issues or because of my skin color. And then he goes on to include a parenthetical with the excuse that a patient said she does not want me because I'm black. He specifically only referred to one instance of this ever happening in any of his prior statements. And in his sworn EEOC charge, he only addresses it twice, in June and September of 2003. You're taking that statement and you're concluding he's talking about one instance? Yes, Your Honor, because with the excuse that a patient said she does not want me. With the excuse that a patient said it, but it was a patient in a number of different occasions. I just don't know how you can take that statement and conclude he's only talking about a single incident. He never, in any of the ten written complaints that appellant raises, he was constantly complaining in this matter. In none of those does he ever address the fact that this is occurring on a twice. Let me ask you, do you know the demographics of the patient population at this facility? I do not have that in the record. Here's what's a little bit troubling to me. If you've got patients who don't want to have somebody black dealing with them, I mean, unless there's just a ton of them, if they're accommodating the patient's request, I don't know how it would be happening weekly, that he'd be getting assigned to somebody who said, I don't want him, and if they're accommodating the patient's request, then unless you're getting a new charge nurse all the time, the charge nurse knows who the patient is, they know who he is, so they just don't assign him to this person. If, like he says, they're accommodating the patient's request, that's what's troubling to me. Maybe they can answer. Because I don't understand how it could keep happening, unless it's a huge facility. But I'm the only person to whom that apparently seems to be important because it didn't come up in the record. I just don't know how it could keep happening. If it's a small facility, you've got charge nurses, you've got patients, you've got a handful of patients who say, I don't want anybody black dealing with me. And if his allegation is they're accommodating the patient's request, I don't know how it could keep happening unless there's a lot of people. You're right, Your Honor, because it's unreasonable to think that this was happening as frequently as it is, especially when Jason Sewell, the director of nursing, says he's only aware of this. It could be because none of us know how many people there are there. What was in the section of the hospital that he worked in in that first few months of work? This was a med-surg unit, which means it's typically patients who are admitted to the hospital. They are often coming out of surgery or they've come in through the ER and then need to be admitted. And so they're there because they are very sick or have suffered a serious injury and they're needing kind of around-the-clock care. So I couldn't tell you, though, how many patients specifically Mr. Dekay was responsible for. How long the average patient stay is. I don't have that information in the record, unfortunately, Your Honor. Did you get your extra five minutes? Get her extra five minutes. Give her five extra minutes. Keep going. I do want to address the issue of the fact that this statement that Mr. Dekay makes in his deposition testimony, that the charge nurses were telling him that his patient assignments were being changed because the patients were saying, I don't want you because you're black. Both of those are grounded in hearsay, two levels of hearsay, in fact, the charge nurse conveying this information and the underlying statement from the patient that I don't want you because of your race. Both of these are inadmissible hearsay. Wait a minute now. The statement the nurse made is not hearsay if she's an employee of the hospital. If she is an employee of the hospital acting within the course and scope of her.  Okay. Isn't part of her job to assign the nurse's aides to patients? It is, Your Honor. But that doesn't get past the underlying hearsay of the patient's statement saying, we don't want you because you're black. And that statement is crucial because it's the only thing that is tying these patient changes to Mr. Dekay's race. And it's inadmissible hearsay. There is no exception for it. Is this argument made in the district court? While we didn't specifically make the Yes or no? No. It was not made to the district court. However, the court, in reviewing this evidence, found that it was unsubstantiated. And, Your Honors, are allowed to assess whether or not this was competent summary judgment evidence. The trial court and this court are always allowed to look at whether or not the evidence being presented by the non-movement is competent summary judgment evidence and is admissible at trial. Therefore, Your Honors, on the Well, there was no question he was being reassigned from one patient to someone else. There's no question about that. We're just talking about the basis for the reassignment. I disagree. I believe that there isn't sufficient You don't even agree that he was being reassigned. On a frequent basis, no, I do not agree with that. I believe that to be unsubstantiated. That's pretty easy to verify. Well, you would think, right, that there would be some other evidence in the record. There would be patient assignment sheets. There would be witness testimony that Mr. Dike could present from other witnesses who saw this occurring. There is no such other evidence. And that was one thing that the court in Highland Capital Management commented on, the lack of other evidence to suggest that the statements that the appellant was asserting in that case were accurate. Well, it's not unusual in summary judgment that all the evidence is not in. That's what happens at the trial, isn't it? That's true, but Mr. Dike has not presented any competent summary judgment evidence into the record that would substantiate these claims. Was discovery complete in this case? Discovery was complete, yes. And, Your Honor, I see, well, I guess I'm back to yellow. It wasn't red for a second. You still have it. One minute and 45 seconds. All right. I think that the Highland Capital Management case is very telling in this instance because the court there found that it is not an improper credibility determination when a non-movement's testimony is rejected, not merely because it differs from the movement's evidence, but because the statements are not supported by the non-movement's own divergent statements. And what the court found telling in that case is that the non-movement never addressed the inconsistencies in the record. And so, too, here, Mr. Dike has never attempted to explain the contradictions between his deposition testimony, which says that these patient assignment changes were happening on a routine basis. The problem is, is to the extent that the exclusion of the deposition testimony was raised on appeal, it was raised in incredibly summary fashion because he was talking about Muldrow. Correct. The entire brief was focused primarily on Muldrow, Hamilton, and this other case, Abdallah, which is really not applicable here. It was not addressing the hostile work environment standards. Appellant seems to be relying exclusively on the EEOC's brief to do that for him, which is improper. I do want to go back to Highland Management because the court there said that while it's true that not every discrepancy in a non-movement's testimony justifies a district court's refusal to give credence to that evidence, a court may decide that there are so many inconsistencies that the testimony does not need to be put before a jury. And I believe this is such a case. With that, Your Honor, unless there are further questions, I will pass over to Mr. Little to discuss the discrimination retaliation case. Thank you, counsel. May it please the Court. Kevin Little for Apple East. And as Ms. Morton noted, I will be discussing appellant's discrimination and retaliation claims aside from the harassment claims discussed by Ms. Morton. Appellant's discrimination and retaliation claims fail because appellant cannot establish a prima facie case of either discrimination or retaliation. And to the extent that the court reaches the pretext question, appellant cannot establish any pretext as to his termination. As the panel has already noted, appellant was terminated after he left for a 30-minute lunch break, came back more than 90 minutes later, and as the district court noted, more than six years later still has not explained his absence, where he was, or what he was doing. Beginning with the discrimination claim, as a threshold matter, the court doesn't need to reach pretext for another reason. The trial court determined not only that appellant had offered no evidence he was terminated based on his race, color, or national origin, but also that he had not met the fourth element of his prima facie case, which is that he was replaced by someone outside of his protected class, or that similarly situated employees were treated more favorably. Appellant has not presented any evidence in the trial court on that issue. And similarly, on appeal, while at pages 19 and 20 of his brief, he makes arguments that there was a scheme to treat him differently. Those arguments are not accompanied by any record citations. And that's because there is no evidence showing this aspect of his prima facie case in the record. And for that reason, the court could end its— What would the comparator be? So a comparator would be someone who performed the same or similar job duties and was disciplined for nearly identical conduct. And the—an appellant has not pointed to any employee who was terminated for having left his unit for 90 minutes outside of his protected class. The comparator would be somebody who didn't get terminated, right? Right, exactly. Yes, Your Honor. Thank you. So who would engage in the same conduct and was not terminated. And there has been—there's nothing in the record showing that or even attempting to show it. As to the arguments about Hamilton and Muldrow. So Hamilton, as an initial matter, was decided before the appellant submitted his response brief at the summary judgment stage. And was not only available to the trial court to consider when deciding the summary judgment, but in fact was actually applied by the trial court. At record 380, the trial court applies the Hamilton standard in explaining the standards for discrimination. And accordingly, there's no reason to remain for further consideration of Hamilton, given that Hamilton has already been considered. Similarly, as to Muldrow, the Muldrow case primarily deals with the standards for determining what's an adverse employment action. As the panel has already noted, the termination here, no one's contesting that that's an adverse employment action. And accordingly, Muldrow, like Hamilton, doesn't really have any applicability here as to the issues on this appeal. Finally, as I mentioned earlier, appellant can't show any pretext as to his termination. In the early morning hours of March 1st, 2018, he left for a 30-minute meal break, was away for more than 90 minutes while on the clock. The hospital conducted an investigation, which, including video evidence, showed him leaving his unit, going to a different portion. Not just a different portion of the hospital, but to a different building in the hospital complex, and not reappearing for another 90 minutes. That has never been explained. And the ultimate, the termination decision was made by the chief nursing officer, Kathy Rubano. Mr. Dike testified that he had no reason to believe that Ms. Rubano had any reason to discriminate or retaliate against him. And accordingly, there's no discriminatory motive in the record. Mr. Dike testified the same about Jerry Vesely, who was the security officer who did the investigation as to Mr. Dike's whereabouts. And as a reasonable explanation for the time that elapsed between his infraction disappearing and when the decision was made to terminate him. Sure. So temporal proximity would arise in the retaliation context. You know, was he retaliated for, you know, making this complaint? He can't establish even a prima facie case as to that because there's no evidence in the record that Kathy Rubano, who made the decision to terminate him, was aware of any protected activity that he had engaged in. And if the decision maker isn't aware of the activity, they can't retaliate on the basis of that activity. In addition, this Court has previously held that if the plaintiff is seeking to use temporal proximity as the sole evidence of causation, then that has to be raised in the trial court. And it wasn't raised here. That's the Trudeau versus the University of North Texas case, 861 Federal Appendix 604. And because it was not raised in the trial court, it has been forfeited here. Why wouldn't they let him review the video? I don't know exactly why they wouldn't let him, but at the meetings where this was discussed, he was consistently asked to explain where he was, and he consistently declined to do so. So I think any review of the video is, to some extent, beside the point. It was reviewed by someone, Jerry Vesely, who Mr. Dike had never met, and who Mr. Dike testified had no reason to discriminate against him. With that, if there are no further questions about the discrimination or retaliation claims, I'll ask the Court to affirm. Thank you, counsel. Thank you. Rebuttal. With regard to the what they call hearsay testimony with regard to the other, the charge nurse, for example, the charge nurse was a supervisor. That evidence would be admissible as a statement against interest or an admission by a party opponent. But the statement was by the patients, by patients. Well, what it was was a statement by the charge nurse saying this is what the patient wanted. No, I thought it was this is what the patient said. Right. But the issue is, were these charge nurses really making it up? For example, there was one instance where Mr. Dike complained to his supervisor about statements by Keith Hernandez. Keith Hernandez was the employee, if you recall, who said I want you to stay 12 feet away from me. I don't like your culture or your race. At any rate, Mr. Hernandez was the one who said there was a patient who said that they no longer wanted to be treated by you. And as it turned out, that was false. Mr. Dike talked to that patient and his family member who said we never said that. So what you had was you have examples of employees making up these false allegations. Mr. Dike also said it was happening at least twice a week. It wasn't just one instance. Wait a minute. If the idea is that the nurse supervisors are making up false allegations, that blows up Mr. Dike's assertion that the reassignments were happening several times a week. No, that's what I'm saying, Your Honor. They're either false allegations that they were making up or they were not it was not happening. I don't know. No, he was saying it was what I'm saying is he was saying it was happening multiple times a week. That was based on these race issues. But I'm telling you also that there were instances where they were then saying that it was happening, but it wasn't in fact true. They were using his race or national origin as a basis to select these patients that they wanted to work on or to eliminate his work, which was disparate treatment and discrimination against Mr. Dike. Those are other examples. And as to the hostile environment claim, we addressed those fully at our briefs at pages 29 through 41. Inartfully, I would admit, but we do go through in detail saying here were all the incidences of discrimination, disparate treatment, and this was the color of the hostile environment to which he was being subjected. More importantly, we specifically say that at addressing the trial court's opinion at page 31 and 32 within that argument. However, as the court noted, those statements with regard to what the nurses said, whether they be admissions or not, they were still admissible and they were not excludable hearsay based on 801. So what we have is we have complaints that he made to his supervisor, Goodwine, and the problem is you have so many supervisors that were involved, including charge nurses. One example is the trial court said, well, there is no evidence that his supervisor, Rubano, at the time she terminated him knew about his EEOC charge that he had filed several months before. In fact, he had filed it in December of the prior year. And to say that she had no knowledge when the company surely had knowledge goes and attacks what Justice Scalia said in his opinion in the Supreme Court, where he said it's improbable to say that they had no knowledge when the company had knowledge of what had occurred. They had received knowledge from the EEOC. As I indicated from the onset, I was not trial counsel, so cannot speak for how it was presented to the trial court. However, it is clear that there was at least some implication of knowledge by Rubano of his prior charges and complaints. There is no basis to say there are no interactions between Goodwine Sewell, to whom he had made numerous complaints, and to Rubano at the time that she made the determination to terminate Mr. Decay in this case. So with regard to discrimination and then retaliation, we've set out ample evidence of issues by their own argument that there were conflicts in the testimony. And that he was not given the preference or he was not given the deference that he was entitled to in the summary judgment review. And we say that the court should reverse and remand back for a trial on the merits or remand to the trial court for reconsideration to the extent the court feels it's warranted. All right, thank you, Counsel. Thank you, Your Honor. The court will take this matter under advisement. We are adjourned.